Westbrook, J.
The first of the above entitled matters is a proceeding by mandamus, instituted by three brothers, who are the nearest of kin to one Denis Coppers, deceased, with the exception of two minor children of the ages of nine and thirteen years respectively, to compel the interment by the respondents of the body of the said deceased in Calvary cemetery, in a ■lot purchased by him in his lifetime ; and the second is an action brought by such brothers in this court to prevent the removal by the defendants of the body of said Denis Coppers from the receiving vault of said cemetery, except for the purpose of burial, as is sought to be compelled by the first proceeding.
The proceeding was originally instituted against *124 “Calvary Cemetery, John Kelly, Hugh Moore and James O’Rorke, trustees and officers of said corporation, exercising the duties and functions of such officers, and being the committee on cemeteries of such corporation, as such officers, trustees and committee,” and the action was brought against “ Calvary Cemetery but, by stipulation of counsel and the order of the court, “ The Trustees of St. Patrick’s Cathedral in the city of New York” were substituted as respondents in the proceeding and as defendants in the action, in lieu and in the place of those first made such. The defendants are a corporation, created by chapter 239 of the Laws of 1817 of this State, and are thereby empowered to hold certain real estate for the purposes mentioned in said act, and among others “the said cathedral and burying-place thereto adjoining.” By virtue of chapter 87 of the Laws of 1864, the defendants also hold certain lands in the county of Queens for burial purposes, and those lands are known as “Calvary Cemetery.”
On December 1, 1873, the defendants executed and delivered to the said Denis Coppers, who was then liv-. ing, but is now deceased, an instrument in writing, in the words and figures following, to wit:
“ Office of 4- Calvary Cemetery, ) New York, Dec. 1, 1873. S
Received from Mr. Denis Coppers seventy-five dollars, being amount of purchase-money of a plot of ground, 8 feet by 8 feet, in Calvary Cemetery.
$75. D. BRENNAN,

Superintendent of Office of Calvary Cemetery.

Section 7. Plot D.
Range 35. 4 Graves, 5, 6, 7, 8.”
Denis Coppers departed this life on August 14, 1879, at Hoboken, in the State of New Jersey, and, by his last will and, testament, directed that his body *125 should “be buried in Calvary cemetery, New York, with or near the remains of my mother, and in the burial lot of ground now owned by me there.” In such will he further said : “I do hereby declare my wish and desire to be that my funeral services be had and held in some Protesta,nt Episcopal church, and that such services and funeral shall be under the direction, control and management of the Order of Ancient Free and Accepted Masons.”
On August 16, 1879, the undertaker who had charge of the burial, at the request of the relators and plaintiffs, made application at the office of the cemetery to open a grave in the burial plot purchased, as before mentioned, and paid to the parties in such office the sum of @7 for the labor of such opening, which money was accepted, and a receipt given therefor. On the succeeding day (August 17, 1879), upon the arrival of the funeral procession with the body of Denis Coppers, the interment in the burial plot and in the grave which had been prepared was refused and forbidden, and permission given to place the same temporarily in the receiving vault of the cemetery, from which its removal and burial elsewhere than in the lot of deceased were threatened, when this proceeding and action were commenced for the objects before stated.
Various objections have been made to both the action and proceeding, founded upon technical grounds, which will be hereafter discussed, but the main proposition involved is this: The defendant is a corporation attached to the Roman Catholic Church, and claims the right to exclude and forbid the interment of the body in the lot purchased by Denis Coppers in his lifetime, because such burial would be contrary to the doctrines of such church, which, it is claimed, forbid the burial in consecrated ground of the body of a non-Catholic, or one who was a member of the Masonic fraternity. As *126 the point just stated is the most important one involved, it will be first examined.
It is not doubted that the defendants have full power, when they have parted with no rights by conveyance or contract, to control and regulate interments in the grounds which they hold for that purpose ; and if the doctrines of the church to which they are attached forbid the burial of the bodies of non-Catholics or of Masons, they may properly, in such cases, exclude those therefrom. This authority, when the saíne has not been surrendered, is not now questioned, but it is claimed by the relators and plaintiffs that the defendants have, by an instrument in writing, parted therewith, having in fact conveyed the fee simple of the land, or at least transferred an absolute and unqualified right, to Denis Coppers, his heirs and assigns, therein, for the purposes of burial.
The paper executed to Denis Coppers in his lifetime is certainly not a deed, which of itself would transfer the fee ; but as it is duly signed, executed and delivered by an officer of the defendant corporation, whose authority to make a valid instrument of that character is not questioned,* and as it declares that $75 have been paid as the “purchase-money of a plot of ground eight feet by eight feet, in Calvary cemetery,” which plot is, by other words and figures in said writing contained, capable of exact location and ascertainment, and as the deceased, in his lifetime, took 'actual possession of such plot, by placing therein the remains of members of his family, it is difficult to say why, under the well-known maxim of the law that “ what has been agreed to be done, and what ought to be done, shall, for the advancement of justice, be regarded as done,” it should not be treated as a deed in *127 fee. The acknowledgment, by a writing duly subscribed by the owner, that such owner had received from another person, the entire “ purchase-money of a plot of ground,” which is fully designated, the delivery to, and acceptance by, such buyer, of the instrument, and that followed by actual possession of the property, would certainly, in ordinary cases, entitle the purchaser to a conveyance in fee simple absolute, and in any controversy between the vendor and vendee as to the use of the premises, though a formal conveyance had not passed, the latter would both in law and equity, be deemed the owner. Looking, however, at the objects and purposes for which the defendants held and owned the lands known as “Calvary Cemetery,” and the language of the instrument, it is reasonably clear that the writing was intended to confer not merely a use of, or easement in, the land, for the purposes of burial, but to convey the ownership of the soil, not for any and every use, but for the sole and only one of burying the dead. If the right intended to be conferred upon the deceased was simply an easement, the paper should have so declared, which it does not do; but, on the contrary, the $75 paid is stated to be the full “purchase-money of a plot of ground”—i. <?., of the land itself. If, then, the words used are limited by the surroundings, which is lessening their legal signifU canee as much as any known rule of law or equity will admit, the defendants are in the position of parties who have conveyed (for that which they are legally bound to do must be regarded as done) to- Denis Coppers, his heirs and assigns, the title of the land, to be used by him and them for the purpose of burying their dead.
If a conveyance in that form had been executed, what would have been the rights of the parties % To the answer of this question the discussion will now be directed.
*128 In the matter of the' Brick Presbyterian Church (3 Edwards Ch. 155), the exact question was before the court. The corporation had, many years ago, executed sundry conveyances, and also leases for nine hundred and ninety-nine years, of certain pieces of ground in the cemetery belonging to it, for the purpose of ■ constructing vaults to contain dead bodies, and these conveyances were construed “to sell and dispose of the land, and not to grant a mere temporary use or privilege to construct vaults in the land, with a reserve of the title to the church.” It was further held to be a “base fee” (page 169), because the uses and objects for which it was to be held were limited (See also 4 Bradf. 503, the opinion of Mr. Samuel B. Buggles). If one of the owners of ground held for a vault had died, and his relatives had sought to place his body in the vault which he had constructed, would it have been in the power of the church corporation to have prevented its deposit therein, upon the ground that the deceased was an Episcopalian and not a Presbyterian, or for the reason that he was a member of the Masonic or any other order ? Manifestly not, for the .corporation had parted with all control over the property, except that which the grant itself provided, or something growing out of the nature and objects thereof. If burial was to be limited to a certain class of persons, the conveyance should so have declared. And what is true and sound in the supposed case is equally so in these under consideration. The defendants are to be regarded as in the position of grantors of a fee of land, to be used and enjoyed, however, by the purchaser, his heirs and assigns, for burial purposes onlj. If his rights were to be in anywise limited, such limitation should appear in the instrument itself, and, not so appearing, no dogma or decree of a church, however right or proper in itself it may be, or however capable of being enforced, if the power and *129 right be properly reserved, can be interposed to prevent the cherished and natural wish of the deceased to have his mortal remains deposited by the side of those of his mother, from being fulfilled.*
Nothing inconsistent with the doctrine which has been enunciated was held in Windt v. German Reformed Church (4 Sandf. Ch. 471). The vice-chancellor, it is true, did decide that mere burial and the payment of charges therefor gave no title to the land, but he also held (page 474), “ when vaults or burying lots have been conveyed by religions corporations, rights of property are conferred upon the purchasers. This was the case with the corporation of . the Brick Presbyterian Church (3 Edw. Ch. 155). The right is like that to any oilier real estate, and it is as perfect without sepulture as it is when the grantee has used it for that purpose.”
There is no similarity, it seems to me, between a conveyance of a pew in a church, and that of a plot of ground in a cemetery, although a supposed one ivas urged upon the argument. The former conveys an interest in a structure only, and although the building in which the sitting is located is, whilst it stands, a part of the realty, yet no actual land is granted. As the thing itself, of which the right to occupy a part is given, is perishable, that given cannot forever be enjoyed, and on account of that fact, and the necessity of alterations from time to time in the edifice, according to the needs of the occupants, which considerations are obvious to the minds of the contracting parties, there must be certain rights reserved to the corporate body owning the fee, which the law has long recognized and sustained.† A deed of a plot of land in a burying-ground, *130 however, conveys that which is capable of being held so long as the earth, of which it is a part, shall endure, and hence there can be no rights reserved, the reservation of which, though not expressed, is implied in the former instance from the nature of the thing granted. But though the distinction pointed out is unsound, and though the argument of the defendant’s counsel, endeavoring to maintain the supposed similarity of the two cases, be sound, it would still be a novel doctrine to enunciate, that the owner of a church pew, whilst the edifice is still standing and unchanged, could be excluded from its use, because his faith was not entirely in accord with that of the denomination to which the organization occupying the building belonged; and, as it also seems to me, it is even more startling to hold, that the body of the human being, whose money, when he or she was living, has purchased a plot of ground for sepulture, can be denied a final resting-place • therein, for the reason that his or her religious belief was not exactly similar to that of those who conveyed an absolute right of burial, without any condition or restraint expressed in the instrument granting it.
It is objected, however, on the part of the defendants, that by their act of incorporation (Laws of 1817, c. 239, § 1), there could be n'o conveyance of an interest in the land without the permission of the court; for it is therein declared “ that nothing herein contained shall authorize the said trustees to sell the real estate unto the said cathedral or congregation belonging, without the concurrence of the chancellor, to be first had and obtained in the manner required by the laws.” It is at least somewhat doubtful whether parties who have assumed to make and execute an apparently valid contract for the sale of an interest *131 in land, with the unrestored full purchase price in their pockets, and possession given to the grantee, are in a position to prevent the use of the property in conformity with its manifest object upon such a ground, and whether or not, in the absence of proof, snch consent as the law requires will not be presumed (Bowen v. Trustees of the Irish Presbyterian Congregation in the city of New York, 6 Bosw. 245). Waiving, however, any further discussion of this suggestion, it is apparent that the permission of the chancellor was only required to such sales as would alienate the property from the uses to which it was to be held, and not to such as were designed to carry out the objects and purposes of the original grant to the defendants. By the act of 1864 (chapter 87), the lands known as “ Calvary Cemetery” are held, and the defendants are empowered to “use” them “for cemetery purposes.” The conveyance of family plots for such object is a part, and a substantial part, of the manner in which cemeteries aré used by corporations created to hold them, and an approval of each sale for that purpose would be unnecessary, and is not within the purview of the statute. And even though this objection would be valid to prevent a transfer of any ownership of the land, it would not prevent the writing given from conferring a valid right of burial, which right, for all the purposes of the present inquiry, must be ample to afford the relief sought, unless, for other reasons, yet to be considered, it must be refused.
It is true, as was urged by the learned counsel for the defendants, that every person who dealt with them was bound to know that they formed a corporation attached to the Roman Catholic Church, and that they had power to make lawful by-laws ;* but, under no rule of *132 law known to me, as has already been intimated, can it be presumed that a party who deals with a corporate body in matters of contract, and pays his money for property or rights, which it assumes to convey, without restriction, is bound to know of articles of faith or private regulations of the corporate body which will make the purchase valueless and the written grant of no avail. Such a doctrine would unsettle well-established principles, and especially that one which declares that a writing is presumed to contain the entire agreement of the parties. Entertaining this view, it has not been deemed necessary to examine the question whether or not the defendants are justified by the law of the Soman Catholic Church in prohibiting the burial of the body of the late Denis Coppers, in the lot purchased by him, upon the ground that he was a non-Catholic or a Mason. If the law of that denomination does justify such action, it is held to be inoperative in this instance, by reason of the written contract which has been executed ; and, therefore, without discussing the doctrine of the church, some technical objections will next be considered. .
It was also strenuously argued that the relators and plaintiffs have no standing to maintain either the action or proceeding, for the reason that they have no title to the burial plot, and are not the next of kin. Are these objections sound ? Denis Coppers died on August 14,1879. Arrangements were made to open the *133 grave on the 16th of the same month, and the funeral was on the 17th (Sunday). By his will he had directed the interment of his body (to repeat his own words) “in Calvary Cemetery, New York, with or near the remains of my mother, and in the burial lot of ground now owned by me there.”
The burial, as directed by will, was forbidden by the defendants on said August 17, but permission to place the body in the receiving vault was given. On the next day (August 18) the relatives of the deceased received written notice from the person who had signed the original receipt for the purchase-money of the lot, “ that the remains of the late Denis Coppers cannot be kept in receiving vault for more than three days; if not removed at the expiration of that time, they will be interred in the unconsecrated ground.” The children of the deceased were infants, the one of the age of nine years and the other of the age of thirteen years. The will of Denis Coppers was not admitted to probate until August 25, 1879. When it became necessary, then, to initiate this suit and proceeding, and when they were in fact commenced, there were no executors qualified to act, and no children of sufficiently mature years to determine what should be done. Under such circumstances the three brothers (and the deceased left no other brothers or sisters, nor father or mother) commenced both the proceeding and action to protect the remains, and to compel a burial in the spot which the deceased had himself selected. Is the law so inhuman as to declare that these brothers, who are the nearest of kin to the deceased, who are of the age of discretion, have no standing in court to effect their pious and lov- „ ing intent ? No attempt will be made to dispute the proposition of the learned counsel for the defendants, that the relators and plaintiffs are not “the next of kin,” for as the deceased left children they could not be; but the admission of that proposition does not *134 admit the conclusion for which they contend. As the next of kin of full age, the plaintiffs and relators, in view of the helplessness and infancy of the children of the dead brother, owed to that stricken family the moral duty, at least, and, perhaps, the legal one, of superintending t.he burial of the remains. If that duty was not one which the law would compel, it will at least respect it, when it is voluntarily assumed, and it will not close the doors of its courts to those who are seeking to have that done which humanity warmly commends. The defendants do not represent the owners of the plot or (if title has not passed) those who control the burials therein. He who paid during life for the right has directed his burial in the spot he purchased, and to prevent the execution of that direction the defendants cannot say the owners of the property are not before the court, nor can they successfully urge that the brothers of the .deceased, under the peculiar circumstances of the case which makes their intervention proper, if not necessary, are so far divested of all duties and rights in the premises as to be powerless to invoke judicial action. The law recognizes. in many cases rights and remedies springing from the necessity of a given case, and when brothers of a deceased person seek to protect his remains from maltreatment or insult, when they are the only persons in a situation to intervene, the law ought not inhumanely to say that they are intruders, having no standing in court for such a purpose, and decline to give a right or remedy which is oftentimes given and created, upon the ground of hecessity, for less humane and meritorious objects.
But the plaintiffs and relators have also a standing in court, based upon a contract with the respondents and defendants. It was the money of the former which the latter received for the opening of the grave. That agreement remains unfulfilled, and the price paid for *135 the labor is unreturned. If the relief asked upon these motions is granted, the contract made will only be enforced against those who have promised performance, and in favor of those to whom the promise was given. Upon this ground, also, as well as upon that based upon kinship to the deceased, and the necessities of the case, it is held that judicial action is properly invoked by those who seek it.
It is also argued that a mandamus is not the proper remedy. It is conceded that the cases are not uniform as to when the writ issues. Numerous decisions, however, can be found, in which it has been held to properly issue to compel a corporation to do that which, by law, it is required to do, especially when no other adéquate remedy exists. If we are right in our view that the defendants should be deemed to be in the position of grantors of the cemetery plot to be owned by the grantee, his heirs and assigns, for burying their dead, then, as they have also received compensation for opening the grave, they are bound so to do. The need of burial is a pressing one, and there seems to be no other remedy which is adequate to the emergency. If, however, the court has jurisdiction of the subject-matter and of the parties, objections founded upon the form of the proceeding have never been favorably regarded by me. Writs were originally devised by courts to redress peculiar grievances, and the power which could create can enlarge the original office, provided the jurisdiction of the court over the subject-matter and of the person is not exceeded.*
A careful examination of the questions which have been submitted lead me to the conclusion that the respondents must open the grave, for doing which they have received payment, and against them, as de *136 fendants in the action, an injunction must issue as prayed for. Such injunction is granted for the reason that as the defendants prevented the interment of the body in the spot to which it was entitled to be interred, and gave permission for its deposit in the vault, they cannot remove the same elsewhere for burial.
The order will be settled on notice, so as to preserve the status of parties pending an appeal, if the defendants elect so to do.

 See Moore v. Rector, &c. of St. Thomas, 4 Abb. New Cas. 51, and note; Burke v. Wall, 39 La. Ann. 38.

 See Fitzgerald v. Robinson, 112 Mass. 371; Bouldin v. Alexander, 15 Wall. 131; Stern v. Congregation, &c., 2 Daly, 415; Sohier v. Trinity Church, 109 Mass. 1.

 For recent cases see Union Meeting-house v. Rowell, 66 Me. 400; *130 Sohier v. Trinity Ch., 109 Mass. 1; Abernethy v. Ch. of Puritans, 3 Daly, 1; Howe v. Stevens, 47 Vt. 262.

 For the general rule that persons dealing with officers of a corporation are chargeable with notice of the restrictions on their powers contained in the by-laws, see Adriance v. Roome, 52 Barb. 399, 411; Dabney v. Stevens, 10 Abb. Pr. N. S. 39; S. C., 40 How, Pr. 341; *132 Sweeney, 415; rev’d as to Stevens, on the ground that under his answer no proof of agreement was necessary as to him, 46 N. Y. 681. And see Driscoll v. West, Bradley, &c. Co., 59 N. Y. 101, 109; affi’g 36 Super. Ct. (J. & S.) 488; St. Patrick’s Ch. v. Abst., 76 Ill. 252.
Compare Western R. R. Co. v. Bayne, 11 Hun, 166, where a director was held chargeable with notice of lack of power.
That evidence of holding out, or of ratification, may supply the defect,—see Dabney v. Stevens, and Adriance v. Roome, above; Phillips v. Campbell, 43 N. Y. 272.

 See 2. R. S. 277 (3 Id. 6 ed. 440), § 1, subd. 3; Code Civ. Pro. § 7, subd. 3.